B. T. King *et al.*, Respondents, v. The Ætna Insurance Company, Appellant.

### St. Louis Court of Appeals, April 29, 1889.

Insurance : COMPROMISE ON LOSS.　A loss having occurred under a fire policy held by the plaintiffs, they agreed with the defendant, the insurer, upon a compromise settlement, whereby a discount of two per cent. was to be made on the amount adjusted, the remainder was to be paid at once by the defendant, and the policy was to be surrendered and cancelled.　Within three days after this settlement, another loss occurred in the same insured premises, and on the next day following this loss, the defendant paid to the plaintiffs the sum agreed upon in the compromise, and the plaintiffs surrendered the policy for cancellation and gave a receipt in full of all claims for loss or damage on stock, etc., insured under the policy in question, reciting that in consideration thereof the said policy was thereby "cancelled and surrendered in compromise settlement."　Afterwards, this suit was brought for indemnity under the same policy, on account of the second loss.　*Held :* Although the payment and surrender were not actually made until after the second loss, yet the plaintiffs' right of indemnity as policy-holders ceased on the date of the compromise, and this extinction of their right was ratified and confirmed by themselves, as relating back to that date, when they received the money, gave the receipt and redelivered the policy—all being done after, and notwithstanding the second loss.　Hence, the plaintiffs had no right of recovery.

King v. Ætna Ins. Co.

*Appeal from the Greene Circuit Court.*—Hon. W. D. Hubbard, Judge.

Reversed.

*Thrasher, White & McCammon,* for the appellant.

The acts of the plaintiffs after the adjustment of the first loss in taking out new insurance in an amount fully covering their stock ; the statement made to L. A. Newton and G. A. C. Woolley, by King, as sworn to by King, Newton and Woolley, that he did not consider the old companies bound after the adjustment and settlement of March 16 ; the assent by King to the statement of Hubbard, one of the adjusters of the first loss, that it would be proper to surrender the policy, that there was a contract to release defendant's policy, and the second insurance was placed on stock on that account ; the testimony of Lamey that the agreement made at the adjustment of the first fire was that "all liability on all the policies should end right here ; " the filing of suits against the new companies for the full amount of the second loss, with the subsequent agreement with those companies for continuing such suits until suits against the old companies could be instituted and determined ; and, finally, the complete execution on March 20, of the agreement made at the first adjustment, and the full release and surrender of the policy to defendant in compromise settlement,—all prove conclusively that plaintiffs have no cause of action against defendant. The compromise is further shown by the acts of plaintiffs in taking out new insurance, by their assenting to statements of others that there had been such an agreement, by executing and carrying out that agreement in surrendering policies of some of the companies and giving the receipts in evidence. " Where parties, by their acts, show their intention and the meaning of a contract, such construction should prevail

over any other meaning and intention which might be given by a court." *Gas Light Co. v. City*, 46 Mo. 127; *Patterson v. Camden*, 25 Mo. 21; *Dobbins v. Edmunds*, 18 Mo. App. 315. In an executory contract, where its execution necessarily involves a practical construction, if the minds of both parties concur, there can be no danger in the adoption of it by the court as the true one. *Topliff v. Topliff*, 122 U. S. 121; *Chicago v. Shelden*, 9 Wall. 54. The compromise agreement and receipt in evidence signed by plaintiffs was a contract and its execution being admitted, the plaintiffs are bound by its terms. *Brown v. Railroad*, 18 Mo. App. 574; *Moore v. Henry*, 18 Mo. App. 40; *Miller v. Dunlap*, 22 Mo. App. 101. The receipt signed by plaintiffs "is not a mere acknowledgment of payment. So far as that, it is merely *prima facie*, but as the evidence of the contract between the parties it is as any other written agreement and cannot be contradicted by oral testimony. *Carpenter v. Jamison*, 6 Mo. App. 220; *Carpenter v. Jamison*, 73 Mo. 356; *Chrisman v. Hodges*, 75 Mo. 413; *Railroad v. Cleary*, 77 Mo. 637; *Koehring v. Muemminghoff*, 61 Mo. 407. Plaintiffs hold the benefit of their compromise settlement with defendant. They cannot maintain this action without first placing defendant in the position it held before the compromise. " A compromise voluntarily made, without fraud or imposition, cannot be set aside however disadvantageous it may be. A person in interest compromising a suit cannot be relieved therefrom." *Steele v. White*, 2 Paige, 478; 2 Lawyers' Ed. N. Y. Ch'y., bot. p 995; *Ins. Co. v. Howard*, 13 N. E. Rep. 103. Plaintiffs cannot, while retaining the benefit of their compromise agreement with defendant—$717.40—thus affirming the agreement signed by themselves, at the same time treat it as though it did not exist. They must first restore defendant to all its rights, as they

existed before the compromise. *Ins. Co. v. Howard,* *supra; McMichael v. Kilmer,* 76 N. Y. 36; *Gould v. Bank,* 86 N. Y. 75; *Kelly v. Kershaw,* 14 Pac. Rep. 804.

*Boyd & Delaney,* for the respondents.

The trial court, sitting as a jury, found the contract to be as contended by King, and there is strong circumstantial evidence to sustain the verdict, and this court will not weigh the evidence, nor reverse the case simply because the judgment appears to be against the weight of the evidence. *Price v. Evans,* 49 Mo. 396; *Rea v. Ferguson,* 72 Mo. 225; *Myer v. McCabe,* 73 Mo. 236; *Gibson v. Railroad,* 8 Mo. App. 486; *Bank v. York,* 89 Mo. 359; *Brown v. Railroad,* 50 Mo. 461; *Johnson v. Building Co.,* 23 Mo. App. 546; *Hulburt v. Jenkins,* 22 Mo. App. 572. The court found the agreement to be that the policies should be cancelled only when payment was made. Payment was not made or tendered until after second loss. Therefore liability attached for second loss, and before any agreement on the part of plaintiff releasing said companies from the second loss is binding, there must be a consideration to sustain it. There was no such consideration, and the alleged releases do not purport to cover second loss, and the testimony proves that the money paid was the adjustment of the first loss, less two per cent. *Ins. Co. v. Kelley,* 24 Ohio St. 345; *Runkle v. Ins. Co.,* 6 Fed. Rep. 148; *Bank v. Hazard,* 13 Johns. 353; 2 Pars. Cont., p. 618. The surrender and cancellation of the policy after loss does not destroy liability. 1 Wood Ins., sec. 113; *Hollingsworth v. Ins. Co.,* 15 Ga. 294; *Van Valkenberg v. Ins. Co.,* 51 N. Y. 465; *Ins. Co. v. Stone,* 3 Allen, 385. The acceptance of return premium and surrender of the policy after a loss does not release the insurers, even though both parties knew of the loss; for from the time of the loss the insurer became an

absolute debtor for the sum lost to the extent of the sum insured, from which liability he could not discharge himself by part payment. 1 Wood Ins., sec. 113, p. 291 ; *Van Valkenberg v. Ins. Co.*, 51 N. Y. 465. Action brought to recover the amount of a policy of insurance for fifteen hundred dollars—five hundred dollars on dwelling house ; six hundred dollars on barn ; four hundred dollars on produce therein. The barn and its contents were destroyed by fire. Defendant did not dispute the liability of four hundred dollars on produce and received a writing declaring that it was received in full satisfaction for the loss, and "cancelling fifteen hundred dollars on said policy." The court held that the payment formed no consideration for the discharge of the defendant from liability as to the barn. *Redfield v. Purchase Co.*, 56 N. Y. 358, spoken of in 1 Wood's Ins., sec. 132. The surrender, cancellation and release is no more than a receipt, but if it is a contract, as claimed by appellants in their brief, it is not a contract under seal, a technical release, and must therefore have a consideration to sustain it. The two fires were distinct, the losses were distinct, and the receipt of payment for one is only a receipt of part payment and does not satisfy the other.

THOMPSON, J., delivered the opinion of the court.

This was an action upon a policy of fire insurance. The questions for decision arise upon a special defense set up in the answer as follows: "Defendant admits its incorporation and authority to do business in this state, as alleged in said petition ; admits the execution, delivery, and assignment to plaintiffs of a policy of insurance on a stock of goods for fifteen hundred dollars, concurring insurance, to the amount of twenty-three thousand dollars, being permitted by the terms of said policy. But defendant says that, at the time of the loss and damage to plaintiffs' stock of merchandise alleged in their petition, the said policy had terminated, was no

longer in force, and defendant was not liable there-
under.   Defendant says that, on the fifth day of March,
1886, the stock of merchandise insured by said policy
was damaged by fire; that, afterwards, on the sixteenth
day of March, 1886, the amount of said loss and damage
was ascertained by plaintiffs, defendant, and the other
said companies holding the said concurrent insurance of
twenty-three thousand dollars; that, at said time,
the plaintiffs, defendant, and the said other insurance
companies entered into a compromise settlement and
agreement, by which it was agreed that the said compa-
nies should each pay its proportionate share of said
loss; that all liability under said policies should cease,
end, and determine on the said sixteenth day of March,
1886; and that, on the payment of its proportionate
share of said loss, each one of said companies should have
delivered up to it for cancellation the policy held in
such company; that all the companies who had repre-
sentatives at the place of said adjustment authorized to
draw drafts on their respective companies, on that day
drew their drafts on their said companies for the
amounts so agreed by them to be so paid, and took up
their policies; that defendant had no representative at
said place so authorized, but sent a draft for the amount
so agreed to be paid, by the first mail, and which was
paid to plaintiffs on the twentieth day of March, 1886;
that, in pursuance of said agreement, plaintiffs took out
new insurance on said sixteenth day of March, 1886, to
the amount of ten thousand dollars, fully covering the
remainder of their said stock; that, further, pursuant
to said compromise agreement and settlement between
plaintiffs and defendant, on March 20, 1866, as afore-
said, defendant paid to plaintiffs the sum of $717.40,
and plaintiffs, in consideration of said sum and of the
said compromise agreement, of March 16, 1886, and
fulfillment of said compromise agreement and settle-
ment, surrendered the said policy to defendant and

delivered to defendant a full and complete release of all liability under the said policy, and of all claim and demand against defendant by reason thereof. Wherefore, defendant having fully answered,'' etc.

No reply seems to have been filed, but the cause was tried as though the special defense set up in the answer had been put in issue by a reply. The trial took place before the court without a jury and resulted in a verdict and judgment for the plaintiffs, from which the defendant prosecutes this appeal.

At the trial the defendant gave evidence tending to establish all the facts set up in its answer. Stated in greater detail than they are stated in the answer, these facts were, that on the fifth of March, 1886, the plaintiff B. T. King, and the plaintiff Callie E. King, his wife, were conducting a merchandise business in Springfield, Missouri, as partners, under the style of B. T. King & Company ; that their stock of goods was at that time insured for twenty-three thousand dollars, in twelve different companies ; that, on the night of March fifth and sixth a portion of their stock was destroyed by fire ; that, thereafter, the several companies carrying the insurance upon it sent adjusters to Springfield for the purpose of adjusting and settling the loss ; that these adjusters were engaged in this duty for about four days and completed it on the sixteenth of March ; that the adjustment was rendered somewhat difficult from the fact that the plaintiffs' ledger was lost and could not be found or produced ; that this circumstance rendered an accurate adjustment impossible, but did not prevent approximate adjustment ; that the source of the fire could not be ascertained ; that some of the adjusting agents were not satisfied—or at least had suspicions—in regard to the honesty of the loss ; that the adjusting agents took the position that their respective companies had, under the present law, sixty days in which to pay their respective proportions of the loss, but that they

were willing to pay immediately, if by so doing they could recall and cancel their policies and save themselves further liability, and at the same time secure a discount of two per cent.; that finally it was agreed on the part of all the underwriters and on the part of the plaintiffs, that the underwriters should at once pay ninety-eight per cent. of the stated loss, in consideration of which immediate payment the policies of the respective underwriters should be delivered up and cancelled; that several of the adjusting agents immediately drew drafts upon their respective companies for their respective proportions of the loss as agreed upon, which drafts were delivered to the plaintiffs, who thereupon delivered up the policies of such companies to their respective agents for cancellation; that the adjusting agents of some of the companies, including the defendant company, were not authorized to draw drafts upon their respective companies, and that, as to them, it was arranged and agreed that as soon as such agents could report the fact of the settlement to their respective companies, such companies would remit to the plaintiffs' exchange for their respective proportions of the loss; that, in pursuance of this agreement, on the twentieth day of March, 1886, the defendant, by its agent, delivered to the plaintiffs the sum of $717.40, being its agreed proportion of the loss; whereupon, the plaintiffs, having first taken independent advice, delivered to the agent of the defendant the following instrument of writing signed by B. T. King, who acted for himself and also for his partner and wife, Callie E. King: "SPRINGFIELD, MO., March 20, 1886. Received of Ætna Insurance Company Hartford, Connecticut, through R. F. Stewart, adjusting agent, $717.40, in full of all claims for loss or damage on stock of general merchandise insured under fire policy number 706, issued at Springfield, Missouri, agency, said loss occurring on March 6, 1886; in consideration of which said policy is hereby cancelled and

surrendered *in compromise settlement.* Having signed duplicate receipts.''

The evidence further showed without controversy that immediately after the adjustment of the loss as above stated on March 16, the plaintiffs took out new insurance on what remained of their stock in four different companies to the extent of ten thousand dollars. The plaintiffs gave evidence tending to show that one of their reasons for doing this was that they were about to purchase an additional stock of five thousand dollars' worth in St. Louis. In this state of things, with this new insurance to the extent of ten thousand dollars in force, a *second loss* occurred on the nineteenth day of March, 1886, the day before the above recited instrument was signed and delivered and the money received by the plaintiffs from the defendant on account of the first loss.

The plaintiff, B. T. King, testifying as a witness, stated the consideration of the settlement of the first loss with the various insurance companies in the following language: ''That discount ( of two per cent.) was given to take up their policies. They claimed that, under the new insurance law, they had sixty days to pay or settle ; and I said if they would take up their policies, I would discount two per cent., instead of holding the money sixty days. I wanted to get to work and move again. This receipt I gave ( referring to the paper above set out) was for the money agreed upon as their proportion of the loss at the time of the first adjustment.'' And further on Mr. King stated the consideration of the agreement thus : '' Q. Didn't you agree to surrender your policies in order to get your money without controversy? A. There was nothing said about policies. I agreed to surrender them for the money. (By the court.) Q. Was anything said about controversy, or was it a separate deal? A. It was to close up the thing, get the money and get to

business. Q. What moved you to be so ready to surrender your policy and take ninety-eight per cent. on the adjustment? A. Well, they said they had sixty days to pay the loss, and one of them proposed to pay right there and then, and I discounted it two per cent., and the others went into it; I agreed to discount the policies for all who would take up their policies."

There was also evidence showing, without dispute, that the four companies who had written the new insurance had paid to the partners their proportion of the new loss as equalized between themselves and the old companies whose policies were still in the plaintiffs' hands at the time of the second loss, upon a written stipulation that the plaintiffs should prosecute suits against these old companies to recover in respect of the second loss. The plaintiffs gave evidence tending to show that they submitted to this exaction of the companies who had written the new policies in order to get as much money as they could, accruing in respect of the second loss. There was also evidence tending to show that suits were pending by the plaintiffs against the companies which had written this new insurance, to recover for the full amount of the second loss, on the theory that such companies were alone liable for it.

The theory upon which the plaintiffs prosecute this suit is that the agreement made between the plaintiffs and the defendant, through its adjusting agent, on the sixteenth day of March, whereby the first loss was adjusted, the proportionate share of the defendant to be paid in cash without the delay of the sixty days, which the defendant claimed it was entitled to under the law, less the discount of two per cent., with the further condition that the policy under which the loss accrued should be delivered up to the defendant and cancelled,—was an *executory* agreement merely, and was not operative so as to discontinue the policy under which the loss was adjusted until the money which the defendant had

agreed to pay to settle such loss should be in fact paid and the policy thereupon surrendered to the defendant; that when, on the twentieth of March, 1886, in pursuance of this agreement, the money was paid by the defendant to the plaintiffs and the policy was surrendered by the plaintiffs to the defendant for cancellation, the second loss having previously occurred, the defendant had become the *absolute debtor* of the plaintiffs in respect of such loss, for its proportionate share thereof; wherefore the surrender of the policy without any new consideration was a *nudum pactum*, and that the plaintiffs' right of action exists precisely as though the policy had not been surrendered,—the loss having occurred while the plaintiffs held it and while it was in force.

On the other hand, the theory of the defendant was that, by the terms of the settlement, the liability of all the companies on the policies was presently to terminate, that is, on the date of the settlement, which was on March 16, before the second fire; that this was a compromise agreement, and hence supported by the consideration which always supports an agreement compromising doubtful claims; and that, whether it was a compromise agreement or not, it was supported by the consideration of an immediate cash payment instead of a delay of sixty days. It will be perceived that the view that the agreement was supported by the consideration last named is deducible from the testimony of the plaintiff B. T. King, above quoted.

There was, then, no doubt whatever,—no question in issue,—as to the *validity* of this settlement of the first loss, so far as a *consideration* was necessary to give it validity. The only question in issue was the question of the *terms* or *meaning* of the contract itself,— whether it meant that the liability of all the companies, including not only those whose agents delivered checks

or drafts to the plaintiffs for their respective shares of the loss on the sixteenth of March, but also those who did not so pay on that day,—was *presently* to terminate, or whether their liability was to continue until they got the money which they were to pay into the hands of the plaintiffs and got their respective policies out of the plaintiffs' hands. As the agreement of settlement between the plaintiffs and the twelve insurance companies liable in respect of the first loss rested entirely in parol, this would have remained a mere question of fact to be determined by the court sitting as a jury upon the evidence, if the plaintiffs had not, in the most deliberate manner, determined it against themselves, after the second loss had happened, by receiving the money which, under the terms of the settlement, the defendant was to pay in respect of the first loss, by delivering up the defendant's policy to it for cancellation, in pursuance of that settlement, and by signing the instrument of writing above set out. It is neither alleged nor proved that this instrument of writing was given by the plaintiffs in consequence of any fraud or mistake of fact, but on the contrary, the plaintiffs' own evidence shows that before it was given and before the money therein recited was received and the policy surrendered for cancellation, the plaintiffs deliberated and had the benefit of independent advice. This instrument, executed contemporaneously with the receipt of the $717.40, agreed to be paid by the defendant in the settlement and adjustment of March 16, accompanied with a surrender of the policy, reciting that it, "is hereby *cancelled* and surrendered *in compromise settlement*,"—is as deliberate a statement of the nature of the contract of March 16, as could have been made, and constitutes an estoppel against the plaintiffs as full and effective as though the money had been paid on that day and the policy surrendered up on that day. After thus *executing* the contract of settlement to all intents and purposes and in the most

solemn manner, they cannot set it aside and sue on the surrendered policy, on the theory that it was in force on the nineteenth of March, when the second loss occurred. To allow them to do this would be to jeopardize all compromise settlements and to turn them into the mere instruments of fraud. It does not appear that the defendant, being *absolutely liable* to the plaintiffs for this $717.40 in respect of the first loss, demanded the execution of this instrument of writing and the surrender of the policy as the condition of the payment of this amount. No state of facts existed analogous to those in the recent case of *State ex rel. Fenlon v. Cummiskey* (34 Mo. App. 184), but the evidence shows without controversy that the transaction was fair, free and deliberate on the part of both the plaintiffs and defendant.

Compromises are favored in law. They tend to diminish litigation and promote the repose of society. Compromise agreements are upheld where the parties fairly suppose that their rights are doubtful, whether they be so or not, and although it should afterwards turn out that one of the parties had no right in law. *Reilly v. Chouquette*, 18 Mo. 220. So strongly does the law favor such agreements that if a judgment is fraudulently obtained in violation of such an agreement, a title acquired thereunder by the plaintiff in the suit, or by any one having notice of the injustice practiced in obtaining the judgment, will be set aside in equity. *Murphy v. Smith*, 86 Mo. 336. The policy of upholding compromises, when fairly made, rests upon the same grounds as those which support a stated account and gives validity to them in all cases, unless overthrown for fraud or mistake. *Pickel v. Chamber of Commerce*, 10 Mo. App. 191; s. c., affirmed, 80 Mo. 65; *St. Louis Gas Light Co. v. St. Louis*, 11 Mo. App. 73. Indeed, it may be said of the attitude of the plaintiffs, as was said of that of that of the defendant in an early case in

this state who sought to avoid a compromise fairly made : "He is concluded by his own compromise ; it was fairly made with knowledge of all the facts. Let him then abide by it." *Draper v. Owsley*, 15 Mo. 613, 616.

The instructions given and refused show that the circuit court tried the case upon views of law quite at variance with those which we take of the case. Two carefully drawn instructions ( numbered three and four ), asked by the defendant on the theory of a compromise settlement, were refused. The court also refused an instruction tendered by the defendant on the theory that the payment of the $717.40, having been made under a compromise settlement, the plaintiffs could not, without restoring what had been so paid to them, repudiate the settlement and bring an action on the policy which had been surrendered in pursuance of it. We take it to be elementary that the money having been received under this agreement and not otherwise as all the evidence tends to show, the plaintiffs could not, on any theory, disaffirm the agreement and bring an action on the policy for the second loss, without surrendering up the money received under the agreement and putting the defendant *in statu quo*.

But it is not necessary to pass in detail upon the instructions. In the view we take of the case, upon the undisputed facts, the defendant was entitled to the instruction which it requested, that the plaintiff could not recover. The judgment will be reversed but the cause will not be remanded. All the judges concur.